IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2021

FILED

02/02/2022

Clerk of the
Appellate Courts

**STATE OF TENNESSEE v. AHREN PRESLEY**

**Appeal from the Criminal Court for Polk County**
**No. 17-CR-140      Sandra Donaghy, Judge**

_____

**No. E2020-01249-CCA-R3-CD**
_____

The Defendant-Appellant, Ahren Presley, was convicted of conspiracy to commit robbery and theft, two counts of felony murder in the commission or perpetration of a robbery, two counts of especially aggravated robbery, two counts of felony murder in the commission or perpetration of a theft, one count of theft of property $10,000-$60,000, and one count of theft of property $1,000 or less. See Tenn. Code Ann. §§ 39-12-103 (conspiracy to commit theft); 39-13-202(a)(2) (felony murder in the commission or perpetration of, relevantly, a robbery or theft); 39-13-403 (especially aggravated robbery); 39-14-103 (theft of property). He received a total effective sentence of two life sentences plus twenty years. On appeal, the Defendant argues that 1) the evidence was insufficient to support all of his convictions, and 2) the trial court erred in imposing consecutive sentencing. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JILL BARTEE AYERS, JJ., joined.

Wencke West, Cleveland, Tennessee, for the Defendant-Appellant, Ahren Christopher Presley.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Shari L. Tayloe, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The instant case stems from the 2017 robbery and murder of Jeremy Walker and Larry Jeffries. Between February 28, 2017, and March 3, 2017, the Defendant and his

mother, Valrie Hart, entered Jeffries' home and stole various electronics and Jeffries' personal vehicle after shooting and killing Walker and Jeffries.

On November 6, 2017, the Polk County Grand Jury returned an indictment against the Defendant for conspiracy to commit robbery and theft, two counts of felony murder in the commission or perpetration of a robbery against Walker and Jeffries, two counts of especially aggravated robbery against Walker and Jeffries, two counts of felony murder in the commission or perpetration of a theft against Walker and Jeffries, one count of theft of property $10,000-$60,000 against Jeffries, and one count of theft of property $1,000 or less against Walker.

At the January 21-24, 2020 trial, Shane Jeffries,[1] the nephew of Larry Jeffries, testified that Jeffries and Walker were roommates living in Jeffries' home in early 2017. Shane explained that he lived with his uncle approximately six months prior to his murder and sometimes still received mail at that address. He last saw his uncle in January 2017 when he went to his home to collect mail. While there, his uncle showed him his "brand new" Toyota RAV4 and new security system. The security system included "a few cameras[,]" a receiver, and a monitor. Shane also remembered there being five televisions and a safe in his uncle's house. He testified that there was also a "fireplace heater" in his "grandmother's room[,]" a tablet computer, and a Samsung tablet. Photographs of those possessions were received as exhibits. Shane agreed that his uncle carried a wallet on his person. Shane testified that he was the person who found his uncle and Walker deceased. He explained that his cousin had called him and asked if he had heard from Jeffries, and Shane and a friend went his uncle's house when Shane got off work at approximately "10[:]30, 11:30" at night.

When Shane and his friend arrived at his uncle's house, he noticed that his uncle's new RAV4 was missing, there were blankets covering the doors and windows, and one of his uncle's indoor dogs was running around outside. Shane "knew something wasn't right." He agreed that his uncle never placed blankets over his doors or windows. Shane then went to Walker's family's home and asked if they had heard from Walker. When they informed Shane that they had not heard from him either, Shane went home and had his roommate drive him back to his uncle's house. They arrived at his uncle's home at approximately 12:30 in the morning. Shane decided to go inside the home and "wiggle[d] the doorknob[,]" which was locked. He then tried to make entry into the home through the air conditioner window unit in his old room, but "something told [him] not to[,] so [he] didn't." Shane then noticed a ladder in the backyard and used it to look inside of the

---

[1]Because the witness and one of the victims share the same surname, we refer to the witness by his first name. We mean no disrespect in doing so.

kitchen.  Once he was on the ladder, Shane observed Walker "in the kitchen laying on his stomach with his hand out in front of him."  Shane then called 911.  Photographs of the crime scene were received as exhibits.  Shane testified that he did not know the Defendant or Hart.

Polk County Sheriff's Department ("PCSD") Deputy David Hugh Cru Ross[2] testified that he and his partner, PCSD Deputy Avery Gray, were dispatched to Jeffries' home on March 3, 2017, in response to Shane's 911 call.  Upon arriving at the crime scene, Deputy Ross made contact with Shane and his roommate, who informed him that they observed a body facedown inside the home.  Deputy Ross climbed the ladder that Shane had placed against the house and saw "what appeared to be a body laying in the living room facedown."  He then "forced entry into the house by kicking the [front] door open."  Once inside the home, Deputy Ross immediately discovered "a deceased individual" who was "l[]ying in what appeared to be a pool of blood" in the living room  The "body in the living room" had his "pockets . . . turned inside out on his pants."  Deputy Ross also smelled bleach upon entering the home and noticed that "the floor was very sticky, [such] that [his] feet would catch when [he] tried to lift [his] feet[.]"  Deputy Ross located "another deceased individual" in the kitchen, who was also lying in a pool of blood with his pockets turned inside out.  There were also "several dogs" locked in a bedroom.  After walking around the house, Deputy Ross noticed a computer stand missing its computer, an entertainment center missing its television, and a security camera with cut cables to what he "assume[d] . . . would have been a TV."  Deputy Ross learned from Shane that Jeffries' RAV4 was also missing.  Photographs of the crime scene were received as exhibits.

On cross-examination, Deputy Ross testified that he did not know who had placed the evidence markers that were depicted in the crime scene photographs received by the court.

Tennessee Bureau of Investigation ("TBI") Special Agent Kendall Stoner testified that she was a forensic scientist and supervisor in the Combined DNA Index System ("CODIS") unit.  She testified that she responded to the crime scene on March 3, 2017, as the team leader for a group of forensic scientists on the violent crime response team.  Agent Stoner explained that the violent crime response team consisted of "a group of forensic scientists that are in all different disciplines" who assist in processing crime scenes.  When the team arrived at the scene, Agent Stoner made contact with Agent Keith Herron, who was the lead case agent.  Agent Stoner entered the residence with two microanalysis scientists, Miranda Gaddis and Lindsey Anderson, and they looked for "very fragile

---

[2] We note that Deputy Ross is referred to as both "David Hugh Cru Ross" and "David Hugh Crew Ross" in the record on appeal.

evidence like shoe prints, shoe tracks, things that can be destroyed just by stepping on it." Agent Stoner agreed that there were shoeprints present at the crime scene. Comparison photographs and "gel lifts" were taken of the shoeprints. Agent Stoner observed blankets and towels over the windows at the crime scene and heard a radio playing beside the front door. She agreed that there was a body directly next to the front door. Agent Stoner testified that her team noticed the pants pockets of the deceased individual were turned inside out, and they "cut out those pockets to preserve for touch DNA" prior to the body being transported from the scene. The team used the same procedure to preserve the inside-out pocket of the second deceased individual in the kitchen.

Agent Stoner testified that there were seven dogs present at the crime scene, and there was "dog poop present" in bedroom number one and between the kitchen and laundry room. She identified photographs of a security camera that her team found behind the front door. Cords from the security camera were "cut" and were not "plugged into anything." There were also loose cords on a desk that "looked like they could have connected to something[.]" Agent Stoner also identified photographs of an entertainment center that had a "a DVD player or a cable box" that was not connected to anything, and there was a "void in the dust on the top" of the entertainment center. Her team also found a Windows brand computer charger and a "Roku, which is like a TV streaming sort of thing" in bedroom number one. She agreed that all of the photographs of the crime scene that were received as exhibits were taken by her team. A three-page evidence report created by Agent Stoner's team was also received as an exhibit.

On cross-examination, Agent Stoner testified that the blankets and towels used to cover the doors and windows at the crime scene were not collected as evidence. On redirect examination, she clarified that they were not collected as evidence because "they did not appear to have any blood staining or any other type of evidence[,]" and "surfaces like that are not good for latent prints because they're rough." Another DNA analyst at the crime scene "also agreed that [the blankets and towels] would not be collected."

David Jaynes testified that he had known the Defendant "for several months" prior to the murders and "sold him some drugs on a few occasions[,] and then his mother took [Jaynes] in for about a week." Jaynes testified that Hart's boyfriend, "Don[,]" left the home, "and that's why they invited [Jaynes] to stay." He explained that he witnessed the Defendant trying to "pick" the lock to a safe over multiple days. When the Defendant got the safe open, Hart asked what he found in the safe, and the Defendant showed her a "revolver" with "bone plates on the handle." The Defendant or Hart "had [the revolver] on them pretty much at all times after that." The Defendant told Jaynes he wanted to "change the handle" because "he didn't want who they had gotten the safe from to recognize it." Jaynes testified that the Defendant and Hart stole the safe from "Christy[,]" whom he also knew as "Lightning." Jaynes reiterated that the Defendant and Hart "had

- 4 -

[the revolver] with them, one or the other, at all times." He elaborated that the Defendant "had it when [they] spent the night in a hallway at a motel[,]" and Hart shot "in the air once threatening somebody." Jaynes affirmed that these events all occurred during the week he stayed with Hart and the Defendant. Hart told Jaynes and the Defendant to leave the home when her boyfriend returned after "five or six days[.]" She "dropped them off" between "the high school and the interstate." Jaynes and the Defendant then "got a ride into Cleveland" and "raided a dumpster behind Dunkin' Donuts and got a bag of doughnuts and used it as a pillow" to sleep in the hallway of a motel.

Jaynes testified that the day after staying in the motel hallway, Walker reached out to him and asked "if [he] was ready to let [Walker] help him out." Jaynes testified that he met Walker once through Grindr, a dating app, and had been to his home "once before." Walker wanted to "keep [Jaynes] from being homeless[,]" and when Jaynes told Walker he "couldn't just leave [the Defendant,]" Walker told Jaynes to bring the Defendant with him to Walker's house. Walker and Jeffries then picked up Jaynes and the Defendant and drove them to their home, where they spent the night. At their home, Jaynes took a shower, and the Defendant was asleep on a pull-out sofa by the time he was done. Jaynes testified that he remembered a television and computer in the living room and a computer in Walker's bedroom. Jaynes explained that he did not remember whether there was a television in Walker's bedroom because it happened "a long time" ago, and he "was on a lot of drugs at the time[,]" though he had been sober for "almost three years" at the time of trial. The following morning, the Defendant called Hart to pick him and Jaynes up from Walker and Jeffries' home. On the way back to Hart's house, the Defendant told Hart "about how [Walker and Jeffries] had a big curved TV and they had a computer and they had a big tablet and things like that." After learning that Walker had offered Jaynes money, Hart "kept telling [Jaynes] to get in touch with [Walker] and get that money from him." When Jaynes did not receive any money from Walker, Hart asked Jaynes "how [he] felt about robbing them." When Jaynes declined and said he "didn't want any part of that[,]" Hart "got pretty upset" and "wouldn't talk anymore after that[.]" The Defendant also stopped talking to Jaynes when he declined to participate in the robbery. Jaynes felt "really uncomfortable" and asked two of his friends, "Andrea and Chancey[,]" to pick him up. Once his friends arrived, Jaynes exited Hart's vehicle, a white Nissan Rogue, and "never saw [the Defendant] or Valrie Hart again[.]" Hart contacted Jaynes a week later and "told [him] that the TBI was wanting to talk to [him] about a stolen credit card." The Defendant also messaged Jaynes on Grindr and said something that "freaked [Jaynes] out and [he] blocked [the Defendant,]" though Jaynes could not remember exactly what the Defendant said. Jaynes also received a text from the Defendant instructing him to "stay out of Cleveland."

On cross-examination, Jaynes reiterated that neither he nor the Defendant were "allowed to stay" at Hart's house when her boyfriend, Don, was present. Jaynes agreed

that Hart had dropped the Defendant and him off "in the middle of nowhere" on another occasion when she "went to Lightning's[.]" Jaynes clarified that when he and the Defendant went to Jeffries' house, they "were all on meth." He stated that he never "encountered" Lightning. Jaynes reiterated that he witnessed Hart firing the revolver.

PCSD Captain Brian Fields testified he was dispatched to the crime scene on March 3, 2017. Upon arriving at the scene, Captain Fields noticed the towels and blankets over the doors and windows and the "wires hanging everywhere, but [] all the equipment was gone." He also heard dogs "scratching and barking" behind a bedroom door and smelled "a mixture of different cleaning solvents[.]" Captain fields observed that "there should have been more blood spatter" present at the crime scene. He elaborated that with "a scene that bloody[,]" there should have been "blood trails" and "paw prints going through the blood." However, "there were cleaning supplies between" the two deceased individuals, and the area around the bodies was "very clean[.]" He also noticed that the pockets on both deceased individuals were turned inside out and heard a radio playing. After determining that the crime scene had been "tampered with[,]" Captain Fields called Sheriff Steve Ross and Kevin Cole to "discuss calling TBI in for the crime scene unit." After calling TBI, multiple TBI agents responded to the crime scene to assist with the investigation.

Captain Fields, Agent Herron, and TBI Agent Danny Fay discovered that Jeffries' credit card had been used at the Mountain View Inn in Cleveland. Captain Fields, Agent Fay, TBI Agent Mark Wilson, and Cleveland Police Department ("CPD") officers went to the Mountain View Inn to determine who had used the credit card there. The clerk informed them that a man and a woman, whom Agent Fields had seen waiting in line at the clerk's desk, had used the credit card to rent a room. Captain Fields and Agent Fay "took off running" and located Bobby Osborne, Skidder Geren, the Defendant, and Hart in two separate vehicles in the parking lot, who informed them that "they were the occupants of the room the night prior." Captain Fields obtained consent to search the two vehicles and found one of Jeffries' credit cards in Hart's white Nissan Rogue where the Defendant had been sitting. Captain Fields and Agent Ray then took the Defendant and Geren to CPD to interview them. Prior to the interview, the Defendant was read his Miranda rights and signed a waiver form, which was received as an exhibit. Captain Fields testified that the Defendant was "very evasive" during the interview and "always avoid[ed] answering the question" that was asked of him. The Defendant's interview was played for the jury. Agent Fay had the Defendant give a written statement at the end of his interview, which was also received as an exhibit. During the interview, the Defendant gave Captain Fields the name and address of Crystal Dillard, or "Lightning." A buccal swab was collected from the Defendant during the interview. The Defendant was "taken back to . . . his mother" at the Mountain View Inn following the interview. Captain Fields did not recall who interviewed Geren.

On cross-examination, Captain Fields testified that the Defendant was not tested for gunshot residue on his hands or clothing during the interview, and none of this clothing items were collected as evidence. He stated that it was "pretty cold" on the night that he responded to the crime scene.

Andrea Doria Johnson testified that she was currently in custody due to a violation of probation arrest stemming from her drug use. Johnson explained that she used to be "a good friend" of Jaynes, though she had not seen him since 2017 at the time of trial. She testified that on February 28, 2017, Jaynes sent her a message on Facebook asking for "a ride" and "somewhere to hang out for a little while." She and her boyfriend, Chancey Wiggins, picked Jaynes up from "the Mexican restaurant in Charleston, the Mexi-Wing." Johnson agreed that she had previously been questioned about that day by Agent Herron. She sent Agent Herron a photograph of the Facebook message from Jaynes, which was received as an exhibit. Johnson stated that when she and Chancey arrived at the Mexi-Wing, Jaynes was waiting outside of the restaurant for them. The trio then went to Chancey's parents' home. Johnson saw Jaynes again later that night "at the Love's Truck Stop[,]" where he was "standing outside of a . . . white SUV" speaking to whomever was inside of the vehicle. Johnson estimated that no more than an hour passed between her leaving Chancey's house and seeing Jaynes at the truck stop. Johnson saw Jaynes "maybe twice" after that encounter, and they "lost contact" shortly after.

Jessica Smith testified that she was a receptionist at CPD but was previously employed as the general manager at the Mountain View Inn in 2017. She identified video footage from March 3, 2017, of guests checking into the Mountain View Inn around at approximately 2:45 a.m.,[3] which was received as an exhibit. Smith also identified the checkout receipt from the room that was rented with Jeffries' credit card, which was also received as an exhibit. According to the receipt, the room was rented by Bobby Osborne with Jeffries' credit card. Both Osborne and Skidder Geren filled out the room reservation form that was included with the receipt. Footage from outside the rented room showed four people entering.

On cross-examination, Smith testified that the Mountain View Inn did not have a "policy as far as verifying information when somebody checks in with a credit card that doesn't match either of their I.D.s[.]"

TBI Agent Mark Wilson testified that he was the assistant special agent in charge for the Chattanooga criminal investigation division. Prior to becoming the assistant special

---

[3] There is a discrepancy in the record as to whether Osborne checked in at 1:52 a.m. or 2:45 a.m.

agent in charge in 2018, Agent Wilson was a TBI special agent field investigator. He was called to the crime scene on March 3, 2017, to assist Agent Herron in the investigation. Agent Wilson testified that he responded to the Mountain View Inn with Captain Fields and Agent Fay upon learning that Jeffries' credit card had been used to rent a room there. When they arrived at the inn, the desk clerk informed them that the group that had rented the room had just checked out. Agent Wilson, Agent Fay, and Captain Fields went to the parking lot, where they encountered the Defendant, Hart, Osborne, and Geren. They obtained consent to search Osborne's red Nissan Sentra and Hart's white Nissan Rogue. Upon finding "several bags, duffle bags, [and] backpacks" that were closed in the Rogue's trunk, Agent Wilson obtained a search warrant to search the bags. Agent Wilson testified that the Defendant was standing next to the passenger-side door of the Rogue when Agent Wilson encountered him. Jeffries' credit card that had been used to rent the room at Mountain View Inn was found between the front passenger seat and the passenger-side door in the Rogue. A gray "lockbox suitcase" was found underneath the Rogue's driver's seat. A receipt from "Food Mart" in Cleveland was found in the Rogue, and the credit card used to make that purchase, which belonged to Walker, was found in the lockbox suitcase. A Samsung tablet and Walker's wallet, containing the credit card, his drivers license, and social security card was also found. The items were placed back into the suitcase, and Agent Herron collected it as evidence. Photographs of the recovered items and the Rogue were received as exhibits.

Skidder Geren testified that he was incarcerated at the time of trial due to a violation of probation arrest stemming from possession of methamphetamine. Geren met the Defendant in February 2017 when he inherited money and wanted to buy "some stuff" from the Defendant. Although Geren "might have wanted" to pursue a romantic relationship with the Defendant, he testified that they were "[j]ust friends" because the Defendant "was a straight guy[.]" Geren elaborated that he and the Defendant would "do drugs together[.]" Geren testified that he was incarcerated from February 21 until February 28, 2017, for failure to appear and did not see the Defendant until "three or four days" after his release. Geren picked the Defendant up from a Cleveland gas station because "he needed a ride." Geren described the Defendant's demeanor as "frantic" and "worried about something[,]" elaborating that the Defendant "kept hiding in bathrooms and stuff." Geren met the Defendant at the gas station, and they were joined by Osborne and Osborne's niece, Emily. The group went to Geren's father's house, which had no power, and the Defendant, Osborne, and Emily went to McDonald's. When the trio returned to Geren's father's house, Emily was no longer with them and had been replaced with "Mike." The group then decided to go to the Mountain View Inn in the "middle of the night" because it was cold in the powerless house. At the inn, the Defendant told Geren he was "tired" and "didn't want to go in and pay for" the room. The Defendant gave Geren his "mom's boyfriend's card to pay for the room[,]" and Geren and Osborne checked into the room under their names. The Defendant told Geren that they "had permission to use" the card.

Geren saw the Defendant pull the card, later determined to be Jeffries' credit card, out of the lockbox suitcase. After registering at the front desk, Geren and Osborne went back to Osborne's car, where Geren gave the Defendant the card back. In the previously exhibited surveillance footage from the inn, Geren identified the lockbox suitcase that the Defendant was carrying in the video as the same one that was found in the Nissan Rogue.

Geren testified that Osborne and Mike did not spend the night in the motel room. The Defendant gave Osborne Jeffries' credit card, and she drove Mike home and returned with "candy and cokes and a torch [lighter]" from Walmart. Osborne left again, and only Geren and the Defendant spent the night in the room. Geren testified that the Defendant "set up a camera" outside the motel room so that he could "see whoever was coming[.]" The Defendant was acting "[n]ervous" and "[k]ind of agitated[,]" but Geren "didn't question" his behavior because "[w]hen people tend to do drugs, they tend to get like that sometimes." Geren affirmed that he and the Defendant used drugs inside the motel room. The following morning, Hart "showed up" in her white Nissan Rogue around "checkout time[,]" at approximately "10:00, 10:30" in the morning. Geren thought that her presence at the motel was odd because the Defendant previously told him that he was avoiding Hart. After Hart's arrival, Osborne also returned, and Geren's friend Jennifer also arrived. Geren, the Defendant, Hart, Osborne, and Jennifer "got high" on meth inside the motel room. Geren and Osborne went to the motel's lobby after considering whether to rent the room for another night but ultimately decided against doing so. In the parking lot, the Defendant put Geren's things into Hart's Rogue because he "was going to leave with them[.]" When they saw TBI agents approaching them, the Defendant and Hart "tr[ied] to get [Geren] in the car to leave really fast." Geren and the Defendant were then taken into custody by "men in suits" who identified themselves as TBI agents. Geren stated that Osborne had passed away at some point prior to trial.

At CPD, Geren was questioned about "the murder of two people[.]" Prior to being told why he was being questioned, Geren "had no idea anything had occurred of any kind." Geren then "flipped out" because he "didn't have anything to do with any kind of murder" and "didn't expect to be in an interrogation for murder[.]" Geren was told "that the credit card belonged to one of the people that had been killed and [they] wanted to know where [he] got it." After questioning, Geren and the Defendant were taken back to the Mountain View Inn. Osborne and Hart left together because the TBI "took [Hart]'s SUV and left them together." Geren called Osborne to pick him up from the Mountain View Inn, and he testified that he was "afraid to talk to" the Defendant after being returned to the motel but needed the Defendant's help to "carry [Geren's] bags down the road thinking [Osborne] would eventually find [him]." While they were walking, Geren asked the Defendant "why [they] were being interrogated" and "did [the Defendant] kill anybody[.]" The Defendant told Geren that "him and his mom did kill somebody. They had killed two people." When Geren asked why they had killed two people, the Defendant responded that "somebody

wanted them to because they owed money for drugs." The Defendant further told Geren that they "shot them in the back of the head[,]" and Hart actually pulled the trigger. The Defendant informed Geren that "he got covered in blood[,] and he enjoyed it." The Defendant clarified to Geren that "the two people they killed owed money" for drugs, and "[s]omebody named Lightning" had "put them up to [it.]."

Geren and the Defendant walked to "the Hardees on 25th Street[,]" and Osborne arrived to pick up Geren. The TBI also arrived and "wanted to talk to [the Defendant] again." Geren and Osborne waited for the Defendant to finish talking to the TBI, and Osborne and Geren then drove the Defendant to Hart's home, but she was not there. They then drove the Defendant to "a grocery store to meet [the] TBI." Geren and the Defendant never spoke about the murders again. Following meeting the TBI at the grocery store, Geren stayed with the Defendant for "a couple of days" until they met up with Hart, and Geren "felt threatened" by her and left. Geren did not see the Defendant again until trial. Geren elaborated that he stayed with the Defendant after finding out about the murders because he "told [the] TBI that [he] would try to get as much information as [he] could because two gay guys had been killed[,]" and he "wanted to help in any way that [he] could." Geren did not learn anything else about the murders than what the Defendant initially told him.

TBI Agent Danny Fay testified that he was dispatched to the crime scene on March 3, 2017. Agent Fay interviewed neighbors of the victims and learned that Jeffries had not spoken to his mother or been at work for several days. Agent Herron obtained a search warrant for Jeffries' bank records and learned that his credit card had been used at the Mountain View Inn, a music store, and Walmart. Agents Fay and Wilson and Captain Fields then went to the Mountain View Inn and asked CPD to meet them there. At the motel, Agent Fay encountered Hart, Osborne, Geren, and the Defendant. While talking to Hart, Agent Fay noticed "a TV and some other items" inside her Nissan Rogue, and Agent Herron obtained a search warrant. Agent Fay arranged transport for Geren and the Defendant, and he interviewed both Geren and the Defendant at CPD. He described the Defendant's interview as "very short, very brief[,] and very vague." He elaborated that the Defendant "separated himself from the scene[,]" said he "didn't know anything about the card . . . or the homicide" but "hope[d] his mom wasn't involved." Agent Fay testified that Geren was "very cooperative" and explained that he and Osborne used the card at the Mountain View Inn because the Defendant "said he didn't have a driver's license or some kind of identification." Geren also told Agent Fay "that there w[ere] some possible things inside [] Hart's car that w[ere] pertinent to [the] investigation." Following the interviews, Agent Fay had Geren and the Defendant transported back to the Mountain View Inn. Agent Fay testified that Geren told him that he witnessed the Defendant carrying the lockbox case and removing Jeffries' credit card from it. At the motel, the Defendant first told Agent Fay that he "didn't have the card or didn't have the [suit]case. And then told [Agent Fay] well,

[he] did have the case, but [he] was just carrying it around" and "didn't know what was in it." Agent Fay later told Bradley County Detective David Harper that the TBI was looking for Jeffries' stolen Toyota RAV4. Detective Harper located the vehicle "at the McDonald's [] on exit 33 where the truck station is." Agent Fay responded to the McDonald's restaurant and had the manager "pull the video of the . . . vehicle being dropped off." He verified that the vehicle in the McDonald's parking lot was Jeffries' stolen RAV4. Agent Fay then went to Knoxville "for the autops[ies]."

On cross-examination, Agent Fay clarified that when he referred to the Defendant's interview as "vague and short," he was describing "how [the Defendant] answered the questions[,]" not the length of the interview itself. Agent Fay could not recall whether he asked the Defendant about the lockbox suitcase during his interview. He testified that he wrote the Defendant's statement out as he was saying it, and the Defendant initialed the statement when it was completed. On redirect examination, Agent Fay elaborated that he read the Defendant's statement back to him before he initialed it, and the Defendant did not ask him to change or correct anything.

PCSD Detective Kevin Cole testified that he was an "evidence custodian" for the PCSD. Detective Cole was dispatched to the crime scene on March 3, 2017. He secured the scene and conducted interviews with neighbors. He was also present at the Mountain View Inn when Geren and the Defendant were taken into custody. Detective Cole also executed a search warrant for the Defendant's Facebook page. He examined the lockbox briefcase, and its contents were entered into evidence. The suitcase included a Samsung tablet, a Windows tablet, four cell phones, Walker's credit card, wallet, and checkbook, nine of Jeffries' credit cards, multiple keys inside of a Crown Royal bag, a methamphetamine pipe, and various other items. Detective Cole also identified and examined a bag containing the ".38 special revolver" that the TBI had "logged into evidence for storage[.]"

On cross-examination, Detective Cole testified that he was unsure of whether any of the items in the lockbox suitcase had been tested for fingerprints. He was also unsure of whether any of the keys in the Crown Royal bag matched the victims' homes or vehicles.

TBI Special Agent Keith Herron testified that he worked in the east criminal investigation division and was assigned as the case agent of the instant case. He explained that a case agent "oversees" and is "responsible for th[e] case." After arriving at the crime scene on March 3, 2017, Agent Herron was tasked with dispatching TBI agents from Nashville to the crime scene. Agent Herron also interviewed Shane Jeffries and some of Jeffries' neighbors. Agent Herron also entered the Toyota RAV4's description and VIN number into the National Crime Information Center ("NCIC") so that local law enforcement would be alerted "if anybody was to run that tag or that VIN[.]" He also

- 11 -

obtained Jeffries' bank records. Based on the bank records, Agent Herron and other agents responded to the Mountain View Inn, where they obtained consent to search Osborne's and Hart's vehicles. Agent Herron interviewed Osborne while her vehicle was searched. He later obtained a warrant to search the bags found in Hart's trunk. Agent Herron "ultimately took possession" of the objects removed from Hart's vehicle, including the lockbox briefcase and Jeffries' credit card. Agent Herron did not collet "any kind of prints, or fibers, or anything like that" from Hart's vehicle because he "didn't find it necessary at the time[.]" After the search was completed, he instructed Agent Fay to take the Defendant and Geren to CPD to be interviewed. Agent Herron spoke to the Defendant once he was returned to the Mountain View Inn. When asked how he obtained Jeffries' credit card, the Defendant told Agent Herron that Hart and Jaynes "went to Polk County and came back with a bunch of items from Polk County." He elaborated that the Defendant told him Hart and Jaynes went at 11:00 p.m. on February 28, 2017, to "two guys in Polk County that they knew" and returned with "computers, electronics, [and] TVs." The Defendant also told Agent Herron that he saw "the outline of a revolver" on Jaynes' person. Agent Herron also "reinterviewed" Geren.

Agent Herron testified that he executed search warrants for Hart's home and Crystal Dillard's home. While executing the warrant on Hart's home, Agent Herron came into contact with Jimmy Hedrick, who rented the bottom level of the split residence, while Hart rented the top level. Hedrick gave Agent Herron "a .38 [special] caliber cartridge that he had discovered inside the top part of that residence." Agent Herron sent the cartridge to the Nashville Crime Laboratory ("NCL"). Hedrick also informed Agent Herron that Hart had given him "some Fender guitar picks" and "a keyboard." Agent Herron discovered that those items had been purchased at Clark's Music Store with Jeffries' credit card. Agent Herron executed the search warrant of Dillard's home "a couple of weeks later" after receiving information that "some items from the Polk County homicide" were at the residence. When he told Dillard the reason they were searching her home, she said, "I want everything from that homicide from Polk County out of my house before you leave today." Dillard pointed out the items that were from the homicide and told Agent Herron that the Defendant "brought them to her residence." Dillard pointed out a television, a heater, a basket, Jeffries' work ID, part of a Cyclops brand security system, and a ".38 Special Smith & Wesson." The revolver was transported to the NCL for testing. CPD later informed Agent Herron that a .38 special caliber bullet had been recovered from Hart's vehicle. Agent Herron also seized "some narcotics" from Dillard's residence. Agent Herron testified that Jeffries' missing RAV4 was recovered from the McDonald's attached the Love's Truck Stop on exit 33 in Charleston on March 4, 2017. A photograph of the recovered vehicle was received as an exhibit. Agent Herron testified that the fair market value of the vehicle was "over 18,000" dollars. Agent Herron inspected the RAV4 when he arrived at the McDonald's and found Jeffries' wallet and bank card inside of the vehicle,

- 12 -

which was otherwise empty. TBI agents processed the vehicle and found latent fingerprints belonging to Derrick Hewitt.

Agent Herron testified that he received "about 6[,]000 pages" of Facebook messenger records from Detective Cole. One of the messenger pages, dated March 12, 2017, was received as an exhibit. The message was between the Defendant and Hart. In the message, the Defendant wrote, "unlocked[,]" and Hart responded, "bump key?" Agent Herron explained that a bump key was "used for lock picking." The Defendant wrote that he had not "gotten it made yet[,]"Hart responded, "Don't u []think we need that[?]" and the Defendant answered that he "couldn't make it here." In another Facebook message, dated February 12, 2017, Hart told the Defendant that "if [he was] alive and safe, [he] better answer [her] by midnight tomorrow." The Defendant responded that he would be "where [he] picked the locks on the vending machine for probably the whole night." Agent Herron testified that he collected two cell phones from Hart, one from Dillard, one from Jaynes, and one from Geren. He stated that the Defendant told him he did not own a cell phone. Agent Herron identified a photograph pulled from surveillance footage of the Defendant carrying the lockbox suitcase at the Mountain View Inn. Agent Herron also identified a Miranda waiver dated October 1, 2017, that was signed by the Defendant prior to his second interview. A recording of the interview was played for the jury. Detective Herron identified another Miranda waiver dated December 19, 2017, that was signed by the Defendant. The December interview was also played for the jury.

On cross-examination, Agent Herron testified that he did not think the two recovered tablets had been "accessed . . . to see who they belonged to[.]" He agreed that Hart was apprehended in Texas. On redirect examination, Agent Herron clarified that Hart did not "fle[e] to Texas" but was living there when the grand jury indicted her.

Jimmy Hedrick testified that he lived in the lower portion of Hart's home, which she shared with her boyfriend, Don Paruda, starting in August 2016. He explained that the Defendant also lived in the home periodically. Hedrick stated he did maintenance on the home. He testified that Agent Herron came to the house and spoke to him, though no one was living in the upstairs portion of the house at that time. Hedrick stated that Hart had given him Fender guitar picks and a small piano keyboard. He gave those items and a ".38 cartridge" to Agent Herron. Hedrick testified that Hart told him that "Don didn't want" the picks and keyboard, and she "didn't have any use for it." He explained that he found the .38 cartridge on the floor of the bedroom "on the very end" in the upper level of the house. Hedrick thought that the Defendant occupied the end bedroom because he knew that Hart and Don occupied the master bedroom. Hedrick was able to distinguish who was in the home based on the way each individual's footsteps sounded in relation to how heavy each individual was and how they walked. He elaborated that Hart was "a petite woman[,]" Don was a "pretty large man[,]" and the Defendant was "larger[.]" One day while the

Defendant was alone in the upstairs portion of the home, Hedrick heard multiple gunshots inside of the home. Hedrick reiterated that he knew that the Defendant was the only person in the home based on the way his footsteps sounded.

On cross-examination, Hedrick testified that he did not see the Defendant "coming and going" very often but could hear conversations through the ceiling of his downstairs portion of the home. He stated he was not "surprised" that the Defendant and Hart weighed the same amount, and he reiterated that "the way people walk is definitely different[,]" regardless of how much they weigh. Hedrick did not contact law enforcement or notice any bullet holes in the home after hearing the gunshots. He did not think that anyone was actually living in the upstairs portion of the home in March 2017. He testified that the Defendant's girlfriend, whom he only remembered seeing once, was "a very small young lady."

TBI Special Agent Joel Wade testified that he was assigned to the digital forensics unit. Agent Wade received Hart's two cell phones from Agent Herron and processed them using Cellebrite computer software. The LG brand phone was registered to Hart, and Agent Wade did not recall whether an owner name was found in the Alcatel brand cell phone. Agent Wade found Facebook messenger chats from both phones, including the ones discussed during Agent Herron's testimony. Agent Wade identified a Facebook messenger chat log, dated February 27, 2017, between the Defendant and Hart. In the chat, the Defendant wrote, "I guess I'm going to Polk County with David then." He elaborated that "Someone is picking us up and going to Polk County for the night[.]" Hart responded that she would pick the Defendant up at 8:00 a.m. At 9:50 a.m. the next morning, the Defendant made "a location entry" in the chat telling Hart where to pick him up. The Defendant told Hart, "It's the trailer all the way at the end of Amber Way." Agent Wade testified that the "location entry" made by the Defendant in the chat gave latitudinal and longitudinal coordinates, which were to 151 Amber Way Trail, the victims' home. In a message dated March 2, 2017, the Defendant asked Hart where she was, to which she did not answer. The next day, Hart sent the Defendant an audio file in the chat. Agent Wade testified that he could not recover the file because it was not saved to the phone. Later that day, Hart messaged the Defendant to say she was "calling lawyers" for him. Hart also called the Defendant through Facebook messenger several times on March 3, 2017. On March 5, 2017, Hart messaged the Defendant and asked where he was.

Agent Wade identified location entries from both Alcatel and LG phones. He explained that location entries were created by connecting the phone to Wi-Fi, using the phone's GPS, by the cellular network giving a "fix point" periodically, and through the use of apps like Facebook messenger. Agent Wade pulled location entries for the LG phone from February 20, 2017, through March 3, 2017, and entries for the Alcatel phone from February 27, 2017, through March 3, 2017. Both phones contained location entries from

- 14 -

the victims' address, the Mexi-Wing restaurant, and the location entry sent by the Defendant to Hart in Facebook messenger. Both phones had a two-hour gap between location entries on the morning of February 28, 2017. The LG phone had an almost six-hour gap between entries later in the day on February 28, 2017. The Alcatel phone's final location entry was made on March 3, 2017, at the Mountain View Inn. On cross-examination, Agent Wade testified that the Cellebrite software could also be used to "dump" tablets and computers. He explained that Facebook provided the "complete record" associated with an account when subpoenaed, not just the Facebook messenger chat log. He agreed that he only analyzed Hart's two phones in the instant case. On redirect examination, Agent Wade clarified that the Cellebrite and Facebook records were in Eastern Standard Time.

Crystal Dillard testified that she was on parole for "selling drugs" at the time of trial and was also undergoing treatment for breast cancer. She affirmed that she also "[went] by the name Lightning[.]" Dillard explained that she served three years in prison for her drug charges beginning in April 2017. Dillard stated that she entered in "an immunity agreement" in exchange for her truthful testimony in the instant case and affirmed that she would tell the truth during trial. Dillard testified that the Defendant and Hart first began coming to her residence to buy drugs from her in 2016 and continuing "almost [un]til[] the time [she] got picked up" on drug charges. She testified that she moved residences in February 2017, and the Defendant and Hart helped her move. The Defendant and Hart bought drugs from Dillard "several times a week at minimum. Sometimes daily." Dillard testified that when she moved residences in February 2017, she borrowed a trailer from a friend to move her things, and "there were things stolen off of it" that she did not realize were missing until she unpacked. She elaborated that a TV, a microwave, and a fire safe containing a .38-caliber gun and possibly drugs were stolen from the trailer. She identified that .38 special with the bone inlay handle that was previously received as an exhibit as the gun that was stolen from her trailer.

Dillard testified that on February 28, 2017, Hart called her and told her that she and the Defendant were in Dillard's driveway waiting for her. When Dillard arrived home, the Defendant and Hart were there with a "brand new 2017 black Toyota RAV4." Hart told Dillard that the RAV4 was "bought on income taxes[,] and the people that had bought it couldn't afford it anymore." Dillard's vehicle was stolen, and Hart told her they bought the RAV4 for her because she did not have a vehicle. Hart and the Defendant were alone and standing outside of the vehicles when Dillard arrived, so she was not sure who drove Hart's Rogue and who drove the RAV4 to her home. The Defendant and Hart also had a laptop with a case, a necklace, and work IDs with them. The Defendant spent the night at Dillard's home that night, and she witnessed him take the necklace and work IDs off his person and place them in a basket, which Dillard "slid under a dresser." Dillard stated that the work IDs belonged to "the two men that had been killed[,]" though she did not know

- 15 -

that anyone had been killed at that point. At "around 4:30" the next morning, the Defendant texted Dillard and asked if he could take a shower.[4] The Defendant was not at her home when Dillard woke up later in the morning. Later that day, the Defendant and Hart arrived at Dillard's home with Hart's Rogue "loaded with things[,]" including three televisions, a heater, and a Cyclops brand digital recorder. The Defendant and Hart told Dillard that they were moving to a two-bedroom apartment and were "downsizing" their things. The Defendant and Hart brought multiple loads of items into Dillard's house, and when her friend noticed a "memory stick" in the Cyclops digital recorder, Hart "lunged across the room to jerk that out of the . . . Cyclops recorder." Dillard testified that it was "understood" that the "stuff they brought in was to be storage[,] and they were going to get it at a later date." She explained that although the Defendant and Hart owed her "a couple hundred dollars for drugs" at that point, the items were not in exchange for drugs. Instead, the Defendant and Hart would "do thing[s that Dillard] needed[,]" and Hart would "knock things off" their bill.

Hart and the Defendant told Dillard that the RAV4 owners were "going to file for it to be stolen so they could collect insurance on it because they couldn't make payments after they had bought it." Dillard decided to sell the RAV4 to "some pretty major people in Atlanta" in the drug trade because she knew they "dealt in cars like that." Dillard only had the RAV4 for "about two weeks total[.]" Dillard did not know that the RAV4 had been "involved in a homicide" when she first received it. She sold the car to someone in Atlanta and "was getting the things done to take it to them" when a friend of Dillard's called her and told her that there had been "a double homicide in Polk County[,] and they[ were] missing a vehicle that fit[] the description" of the RAV4. Her friend, Dale Click, read her the license plate of the missing RAV4, and Dillard checked it against the one that the Defendant and Hart had given her. She became "frantic" when she realized that the license plates matched and "wasn't going to take something that was done in a heinous act and keep that piece of evidence if it may be something to give a family justice." Sometime after receiving the phone call from Click, the Defendant texted Dillard and told her not "to take the car into town" because "s**t's hit the fan."

Dillard described the Defendant and Hart as "peculiar" but stated that the Defendant was "a very intelligent person." She elaborated that he could "actually make a key for you[r] lock, if you lost a key. He wouldn't just pick the lock. He could make a key[.]" Dillard explained that she described the Defendant as "peculiar" because of the "way he clung to his mother" and the "people that he had around him[.]" Dillard testified that the Defendant was acting "peculiar" on February 28, 2017, when he spent the night at her

---

[4] It is unclear from the record whether the Defendant "texted" Dillard on Facebook Messenger or sent an actual text message from a phone. The record otherwise indicates that the Defendant did not own a cell phone, or at the very least did not own a cell phone that had a phone number registered to it.

- 16 -

house. She stated that the Defendant was "in-depth trying to get . . . that laptop reset" and was "in the room by hi[m]self. He didn't go anywhere else. He . . . just was real withdrawn, more so than normal." After learning that the RAV4 was stolen, she called her friend, Derrick Hewitt, and told him that the RAV4 had been stolen from a murder victim. She asked him to help her get rid of the car, and when he refused, Dillard reminded him that his fingerprints were already in the vehicle. Dillard told Hewitt that they needed to "wipe the vehicle clean" and explained that she could not call the police because she "had drugs in the house." She decided to "take [the RAV4] to the Calhoun exit and leave it there so it could be found." Dillard testified that she and Hewitt wiped the vehicle for three and a half hours, including the inside, outside, undercarriage, and tires. Hewitt ended up leaving the RAV4 in the Love's truck stop parking lot while Dillard watched from inside the store.

Dillard testified that she never saw the fire safe again after it was stolen but later found her stolen gun "on top of taped boxes" that she had not yet unpacked. She stated that "[s]omebody had just placed it there." Dillard found the gun after the TBI had questioned her about the murders. She picked up the gun and moved it to her bedroom upon finding it. Dillard did not see who returned the gun, but she "assume[d] that maybe [the Defendant] might have been . . . in one of those [vacant buildings near her home] or staying around." She elaborated that she kept her front door locked so she believed that the Defendant "had to have picked the lock or gotten in through a window[.]" Dillard testified that when the TBI executed the search warrant for her home, she told them that she "didn't want those thing[s] in [her] house" and "wanted the case to be opened up and the family to have justice[.]" She told the TBI she would not talk to them without her attorney present. She affirmed that the things that the TBI removed from her home included the televisions, heater, and Cyclops recorder. Dillard testified that she never met or saw Walker or Jeffries, never sold them drugs, and "absolutely [did] not" tell the Defendant and Hart to kill them because she "had no reason to do that." Dillard clarified that she had been on supervised parole "for two to three months" at the time of trial and had "never failed any" of her required drug tests. She stated that she was receiving chemotherapy and hormone replacement therapy as part of her treatment for breast cancer and was not "under the influence of any illegal drugs" during her trial testimony.

On cross-examination, Dillard testified that her stolen fire safe had a combination lock. She agreed that she used Hart's Rogue "to do things" and that Hart had driven her to Atlanta on one occasion. She denied that she had "wiped down" other vehicles prior to the RAV4 and only did so because she "didn't want it to come back to [her]" and she "knew that the family needed to have the material back." Dillard remembered that the Defendant and Hart gave her the RAV4 on February 28, 2017, because she wrote the date down and had told the date to police in previous statements. She denied that she had ever "ordered anyone to enforce a debt on [her] behalf" or "ordered [Hart] to enforce a debt for [her.]" She explained that she "would not let anybody get in a deep debt that [she] couldn't afford

to pay for." Dillard testified that she believed that Hewitt "pled guilty to his involvement" in the disposal of the RAV4 and affirmed that she was originally charged in connection with the murders and disposal of the RAV4 but had her charges dropped "because of [her] cooperation[.]" Dillard reiterated that she never met the victims and never went to their home. She testified that people paid her for drugs with both cash and other items, but it was "very unusual" for someone to give her a vehicle. She agreed that she ultimately recovered her stolen car. On redirect examination, Dillard clarified that she was currently on parole for a ten-year sentence, and her agreement with the State "was that [she] d[id] some time on the drug charges." She agreed that the Defendant texted her to ask to take a shower on the same day that he gave her the RAV4, which was February 28, 2017. She again reiterated that she never met Jeffries or Walker and did not have "any involvement in the homicide[.]"

Shane Harold testified that he worked for the Monroe County Sheriff's Office as a forensic detective from 2008 until 2018. In 2017, Agent Herron gave Harold the phone he collected from Dillard to analyze. Harold identified call logs and text messages that were received from a phone number labeled by Dillard with the Defendant's name. Harold identified a message sent from the Defendant to Dillard at 4:35 a.m. on March 1, 2017, asking if he could use her shower. On March 4, 2017, at 6:54 a.m., Dillard received another text message from the Defendant stating, "Don't take that into town. Sh** hitting the fan."

Derrick Hewitt testified that he knew the Defendant and Hart through Dillard, though he did not "have any real personal contact with them." Hewitt helped Dillard move to her home in 2017 and saw the Defendant and Hart at that time. Hewitt never saw the Defendant without his mother or vice versa. Hewitt testified that he knew the Defendant and Hart had given Dillard the RAV4 because he "overheard [the Defendant and Hart] talking on . . . how do you like the new car we got you." He did not remember how long Dillard kept the RAV4 but estimated "[m]aybe a week." Hewitt was "under the impression at first they [the Defendant and Hart] let [Dillard] borrow the car[,]" and Dillard "was going to take it and drop it off to . . . whoever it belonged to." He testified that Dillard "freaked out and wanted to get rid of" the RAV4 when she learned that it had been involved in a homicide. Hewitt also "freaked out" because Dillard had picked him up in the RAV4 "so [he] had been in that car[,]" but he "had no dealings with how they got it or anything of that nature." Hewitt helped wipe down the RAV4 and take it to the Love's truck stop because he "panicked" and "wanted nothing to do with whatever was going on." Hewitt testified that he did not know Jeffries or Walker, did not kill them, and had never been to their residence. He agreed that he pled guilty to tampering with evidence with respect to wiping down the RAV4 and had previously been charged with drug offenses. Hewitt affirmed that he was on probation at the time of trial and had to take periodic drug tests and report to his probation officer, with which he had been "compliant[.]" He had also

- 18 -

completed drug rehabilitation at the time of trial. Hewitt did not see Dillard, the Defendant, or Hart following the events surrounding the RAV4.

On cross-examination, Hewitt elaborated that he was on methamphetamine at the time of the events in question. He agreed that he told police in March 2017 that Hart acted as though the RAV4 belonged to her.

CPD Officer Taylor Thompson testified that he was present for a traffic stop of the Defendant and Hart on March 19, 2017, at approximately 4:00 a.m.[5] The Defendant was in the driver's seat, and Hart was in the front passenger seat. Officer Thompson conducted a search of the vehicle and located "a small box [containing] a .38 Special bullet" in the backseat. The bullet was taken to CPD and logged into evidence.

Dr. Amy Hawes testified that in 2017 she was employed as an assistant medical examiner at the Knox County Regional Forensics Center. Dr. Hawes was accepted by the court as an expert in forensic pathology. Dr. Hawes conducted the autopsies of both Jeffries and Walker on March 4, 2017. Walker had a gunshot wound to his back and a gunshot wound to the "left back side of [his] head." Walker's shirt contained burnt gunpowder, or soot, which "indicate[d] that [the] gun was held relatively close to the shirt when it was fired." Dr. Hawes defined "relatively close" as "anywhere from a few inches up to a couple of feet away." The skin on Walker's back near the gunshot wound also showed evidence of "stippling[,]" which "occurs when unburnt gunpowder strikes the skin." Dr. Hawes testified that the bullet that struck Walker's back "traveled from back to front[,]" starting at the left side of his back and going through "a rib, the diaphragm, which is your muscle that controls your breathing, the stomach, the liver, and the mesentery, which is the connective tissue associated with your bowels." The bullet was found in Walker's abdomen, and Dr. Hawes testified that such a wound would not cause immediate death. She elaborated that someone with such a wound could survive for "potentially minutes" but not hours. Dr. Hawes testified that the gunshot wound to the back of Walker's head also showed evidence of soot, and she estimated that the gun "would [have] be[en] very close, if not [] in direct contact with the skin when it was fired." Walker also had an injury to his ear which "occurred because either fragments of bullets or fragments or bone were exiting the scalp and exiting the ear." Dr. Hawes stated that "a gunshot wound to the head like this" would cause "immediate incapacitation if not immediate death or near immediate death." The bullet that caused the gunshot wound to Walker's head was found "in the right side" of his brain and traveled "from left to right" without "any significant up

---

[5] The record does not indicate whether the vehicle involved in the traffic stop was Hart's white Nissan Rogue.

or down deviation."  The bullet was taken into evidence and given to law enforcement.  Dr. Hawes affirmed that Walker's cause of death was "gunshot wounds of the head and torso."

Dr. Hawes testified that she recovered a "loose metal fragment" from Jeffries' clothing, which she gave to law enforcement.  Jeffries had a single gunshot wound to his head, and Dr. Hawes stated that the gun "was held very close, if not tightly against the skin when it was fired" based on the soot surrounding the gunshot wound.  She did not recover a bullet from Jeffries because it "exited on the right side of his forehead."  Hawes testified that the bullet path was "back to front, left to right, and very slightly upward."  Such a wound path "likely" caused "immediate [in]capacitation[.]"  Jeffries' cause of death was "gunshot wound of the head."  Everything that Dr. Hawes recovered from the victims' bodies was given to law enforcement.  Photographs from both autopsies and Dr. Hawes' reports were received as exhibits.

TBI Agent Jessica Hudson testified that she was special forensic scientist and was assigned to the firearm and toolmark identification unit in 2017.  Agent Hudson was received by the court as an expert in firearms examination.  Agent Hudson was dispatched to the victims' home as part of the violent crime response team led by Agent Stoner.  Her "specialty" was "to identify and collect any evidence pertaining to firearms" at the crime scene.  Agent Hudson analyzed the bullets and bullet fragments pulled from the victims' bodies by Dr. Hawes for "class characteristics[,]" which consisted of caliber and number, direction, and size of the "lands and grooves" on the bullet.  She affirmed that "class characteristics" are caused by the gun from which the bullets are fired.  Agent Hudson examined the .38 special revolver from Dillard's home in order to "help with th[e] examination" of the bullets and bullet fragments.  Agent Hudson testified that upon receiving a gun for examination, she always performed a "field test" to make sure "everything seems to be working properly[.]"  She also "checked to see if the safety features are functioning as they should" and "look[ed] at the barrel and count[ed] the land and grooves inside the barrel and notate[d] that and then that can give [her] an immediate answer" as to "whether the bullets when examined are going to have . . . some of the same characteristics [as the gun] or not."  Agent Hudson testified that the bullets removed from Walker's abdomen and his brain had the same "class characteristics" as test-fired bullets from the revolver.  She elaborated that the bullets did not have "individual characteristics" from the revolver because they had a "coating" that "almost prevent[ed] a lot of the individual characteristics from being transferred onto the bullet."  She agreed that a bullet hitting a rib and ending up in an abdomen "would be something that would have caused [her] [] not [to] have all the characteristics that [she] would need to say[, ']yes, this absolutely came from this gun[.']"  Agent Hudson explained that the same class characteristics could be caused by different guns.  She testified that the bullets and fragments collected by Dr. Hawes and the bullets test-fired from the revolver were "all .38[-]caliber" with five lands and grooves.  Agent Hudson also analyzed the .38 special

cartridge case that was found at Hart's residence and determined that it was fired from Dillard's revolver. Agent Hudson also performed testing regarding the hole in Walker's shirt caused by the revolver and determined that the gun was discharged at a distance of "greater than one inch by less than five feet" from Walker's back. She explained that there was a large range in the distance estimation because she did not have the "exact ammunition" that was used to kill the victims. She testified that multiple brands of bullets were used in the revolver. She agreed that the bullets recovered from Walker's abdomen and brain were "consistent with having been fired from" the revolver.

On cross-examination, Agent Hudson testified that she did not measure the "height of the person that shot the gun" when analyzing the bullets and revolver because that was not part of her typical duties. She reiterated that she could not definitively say that the bullets recovered from Walker's body were fired from the revolver. On redirect examination, Agent Hudson clarified that the .38 cartridge found in Hart's residence was conclusively fired from Dillard's revolver, and the cartridge from Hart's vehicle had never been fired from a gun.

TBI Agent Derek Proctor testified that he worked in the forensic biology unit in 2017. Agent Proctor was received by the court as an expert in serology and DNA. He explained that the "main goal" of his unit was "to take bodily stains or skin cells and develop a DNA profile from those." Agent Proctor received blood DNA samples from Walker and Jeffries and DNA pulled from buccal swabs for the Defendant and Geren to use for comparison against the various items he was given by Agents Stone and Herron for DNA testing. Agent Proctor testified that he did not test every piece of evidence given to him because "[t]ypically on a homicide[, the TBI] start[s] with ten probative pieces of evidence[,] and [they] work to see if [they] get any results. At that point [they] will either work more evidence or write up a report." He elaborated that this method allowed him to "triage" what could potentially be hundreds of pieces of evidence in "larger cases[.]" Agent Proctor tested both Jeffries' and Walker's pants pockets but was unable to conclusively identify any DNA present in the pockets other than that of their respective owners, though he was able to determine that there was at least one other individual's DNA present in all but one of the pockets. He agreed that he was only looking for "touch DNA" in the pockets. Agent Proctor also tested the RAV4's steering wheel for DNA evidence and obtained a DNA profile "consistent with a mixture of at least two individual[s], including at least one male[,]" but was unable to make any further conclusions. He explained that "many things" could affect the amount of DNA present on a piece of evidence, including the texture of the evidence and for how long an individual touched it. He agreed that wiping a piece of evidence "has the potential to take off DNA" but may not "take away all of the DNA that is present." A soda can and tissue collected from a kitchen chair contained Jeffries' DNA. Agent Proctor explained that even with known DNA samples, he could not make any "inclusions or exclusions" from the DNA mixtures he

found from the pants pockets and steering wheel with respect to the minor DNA contributors.

Agent Proctor also examined the revolver from Dillard's residence for DNA. He tested the muzzle, base, inner portion of the barrel, trigger, and other "textured portions" of the revolver for DNA and found Jeffries' DNA and at least one other individual's DNA. The "textured portions" of the revolver contained DNA from at least three individuals, one of whom was male. Agent Proctor analyzed the Cyclops brand digital record and found DNA of "a mixture of a least four individuals including a male." He did not compare the mixture to the known DNA samples he possessed because he could not pull any individual DNA from the mixture. Agent Proctor agreed that house cleaning solutions would "remove and/or degrade the DNA that is present" on a piece of evidence. He affirmed that he typically performed his DNA testing before a gun was transferred to the firearms unit for ballistics testing.

The Defendant elected not to testify on his own behalf. At the close of all proof, the Defendant moved for a judgment of acquittal, which the court denied. The jury convicted the Defendant as charged in all counts.

**Sentencing.** At the Defendant's sentencing hearing, Rebecca Woodard, Walker's mother, gave a victim impact statement. She stated that Walker's father had a "nervous breakdown" over his son's death, and "[t]here's not a day that goes by that [she] d[id]n't think of him and what he went through." Woodard described Walker as "a really good person" who would give "anybody the shirt off [his] back[,]" and she noted that Walker "had been diagnosed with mental disabilities from [a] young age."

Gina Hale, Jeffries' sister, had her victim impact statement read to the court. In the statement, Hale stated that Jeffries "had the biggest heart of anybody" that she knew and noted that "his kindness is what ended his life" in allowing the Defendant to spend the night at his home. Hale explained that she knew something was wrong when Jeffries did not make his daily call to their mother, and she had her nephew, Shane, go check on Jeffries. She described how Jeffries became a father figure to Shane after his own father passed away. Hale wrote that her "anxiety [went] crazy and [her] stomach churned" whenever she thought about the trial, "how [the Defendant] would look to [them] and grin when he thought nobody else was looking or how [Hart] walked out blowing kisses to her daughter knowing that [Hale's] mother would never get to do anything like that to her son because of her." Hale wrote that she was "in shock" when she went to Jeffries' home and saw the blood that remained there and stated that "[g]athering [Jeffries] belongings was one of the hardest things [she] ever had to do." Hale also described how their mother was "devastated" over losing her son and that she no longer leaves her home "to do the things she used to do." Hale explained she no longer felt safe, had missed multiple days of work,

and was prescribed anxiety and depression medicine that cost "over a hundred dollars" each month. Hale also wrote that her doctor recommended counseling, but she had not received any because she could not afford it.

The Defendant's amended presentence report was also admitted at the sentencing hearing. Evidence was offered showing that the Defendant was convicted of three misdemeanor theft offenses prior to the instant case. His probation officer in those cases stated that the Defendant "did not do well" on probation and had "two violations of probation for not reporting[.]" The Defendant self-reported that he could not remember the last school attended because he "dropped out multiple times" but noted that he completed tenth grade and obtained a GED. He self-reported his mental health as "fair" but noted that he was previously diagnosed as "being bipolar" and as "being schi[z]o-[a]ffective" and was not taking any medication for those diagnoses. The Defendant reported working for Amazon for a few months, but Amazon never verified such employment. The Defendant also reported selling "drugs and firearms" for a living since the age of 13 and noted that he would supplement his income "working in the restaurant industry." The Defendant reported that he had "used every drug imaginable except for heroin[.]" The Defendant declined to provide a statement regarding his convictions in the instant case. The Defendant's "Strong-R" assessment concluded that his risk level was high for "violence, property[,] and drugs." His needs evaluation also put him in the "high risk" category for "aggression," "mental health," "residential," and "employment."

The trial court merged Count 2 (felony murder in the commission or perpetration of a robbery – Jeffries) into Count 4 (felony murder in the commission or perpetration of a theft – Jeffries) and Count 6 (felony murder in the commission or perpetration of a robbery – Walker) into Count 8 (felony murder in the commission or perpetration of a theft – Walker). The trial court classified the Defendant as a dangerous offender, finding his "behavior indicate[d] little or no regard for human life and that he had no hesitation about committing these two murderers and especially aggravated robbery and thefts in which the risk to human life was high." The trial court imposed consecutive life sentences for Counts 4 and 6. The trial court also imposed twenty-year sentences each for Counts 3 and 7, to be served concurrently with each other but consecutively to the two life sentences, and sentenced to the Defendant to three years in Count 1, four years in Count 5, and 11 months in Count 9, all to run concurrently with Count 4. This equated to a total effective sentence of two life sentences plus twenty years. This court waived the timely filing requirement, and the Defendant filed a notice of appeal on September 17, 2020.

## ANALYSIS

**I. Sufficiency of the Evidence.** On appeal, the Defendant states generally that a "rational trier of fact should not have found [the Defendant] guilty" based on a lack of "DNA, fingerprint, or other physical evidence linking [the Defendant] to the crime." He does not specify which elements of which convictions the State failed to prove, only asserting that Geren's testimony was not "convincing" proof, reiterating that "no rational trier of fact could have found [the Defendant] guilty" given "the absence of any convincing proof[.]" The State responds that such an argument "discounts ample witness testimony to the contrary" and that "credibility determinations are reserved for the jury." We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); Hall, 976 S.W.2d at 140. The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant to the instant case, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . [or] theft[.]" Tenn. Code Ann. § 39-13-202(a)(2). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a). Conspiracy is committed when two or more people, "each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." Tenn. Code Ann. § 39-12-103(a).

Viewed in the light most favorable to the State, the evidence shows that the Defendant and Hart stole a safe from Dillard while she was moving residences, and the Defendant picked the lock to the safe, removing the bone-inlay .38 revolver from the safe. This occurred in the week that Jaynes stayed with the Defendant and Hart. Jaynes testified that the Defendant and Hart always had the revolver on their person after removing it from the safe. After Hart told Jaynes and the Defendant that they had to leave her home, the victims allowed the Defendant and Jaynes to spend the night in their home. Hart picked Jaynes and the Defendant up from the victims' home the following morning. Location entries retrieved from the Defendant's and Hart's cell phones corroborated such. The Defendant told Hart about all of the possessions that the victims had in their home on the drive home, and Hart asked Jaynes whether he wanted to help them rob the victims. Jaynes declined and felt unsafe with the Defendant after doing so and asked his friend Andrea, who gave similar testimony, to pick him up at the Mexi-Wing restaurant in order to get away from the Defendant and Hart. The Defendant later told Jaynes to "stay out of Cleveland." The Defendant and Hart later returned the victims' home and shot both Jeffries and Walker at point blank range in the back of the head and Walker an additional time in the back. They removed anything of value from the house, including televisions, tablets, a heater, and a Cyclops brand digital recorder. They emptied the victims' pockets and removed their wallets and work IDs. The Defendant and Hart cleaned up the crime scene with multiple cleaning solutions. They also took Jeffries' brand-new Toyota RAV4. Later, Hart and the Defendant went to Dillard's house and gave her the RAV4, telling her that the owners could no longer afford the payments and had gotten rid of it. Hart and the Defendant also put televisions, a heater, the Cyclops digital recorder, and the victims' work IDs in Dillard's house. When Dillard's friend noticed a memory stick in the digital recorder, Hart "lunged" and grabbed it away from him. The Defendant stayed with Dillard that night and texted her at 4:30 in the morning to ask to use her shower. After leaving Dillard's house, at some point the Defendant met with Geren. The Defendant removed

Jeffries' credit card from the lockbox suitcase and gave it to Geren and Osborne to pay for a motel room at the Mountain View Inn. The Defendant told Geren and Osborne that the credit card belonged to his mother's boyfriend and that they had permission to use the card. The Defendant gave the same card to Osborne to pay for food from Walmart. The Defendant was shown on the motel's security footage carrying the lockbox suitcase. TBI agents picked up the Defendant and Geren at the Mountain View Inn. After searching Hart's Rogue, they found the victims' credit cards, wallet, ID, and tablets in the lockbox suitcase. One of the victim's credit cards was also found wedged in the passenger-side car door. Afterwards, Geren asked the Defendant if he had anything to do with the victims' murders. The Defendant confessed to Geren that he and his mother had robbed the victims, giving details about the manner in which the victims were killed. The Defendant told Geren that his mother actually pulled the trigger but that he "enjoyed" being covered in the victims' blood.

After news of the RAV4 being involved in the homicides was released, the Defendant told Dillard not to take the car into town because "s***" had "hit the fan." Dillard and Hewitt abandoned the car at a McDonald's restaurant connected to a Love's truck stop so that they would not be implicated in the murders. When the TBI searched her home, Dillard pointed out all of the items that the Defendant and Hart brought in her house, including the victims' work I.D.S, which she saw the Defendant remove from his person. Dillard testified that the Defendant was skilled at picking locks and could even create keys for locks. Upon searching Hart's residence, Hedrick turned over a .38 cartridge that he found in Hart's residence that was conclusively fired from Dillard's revolver. Hedrick also testified that he heard the Defendant shooting a gun in Hart's residence when he was home alone. Hart also gave Hedrick Fender guitar picks and a piano keyboard that had been purchased with the victim's credit card. At some point, the Defendant and Hart were pulled over by police, who found an unfired .38-caliber cartridge in the vehicle they were driving. Dillard's revolver later reappeared at her home without her knowledge.

Despite the Defendant's argument that a reasonable jury could not convict him because there was no forensic evidence tying him to the crimes, we conclude that the State presented more than enough evidence to sustain his convictions. Though there was no DNA evidence tying the Defendant, or anyone, to the crime, there was eyewitness testimony that evidenced the Defendant planning the robbery with his mother, possessing the likely murder weapon, giving his friends Jeffries' credit card to pay for multiple things, and possessing the lockbox suitcase that contained many of the victims' possessions. Further, there was witness testimony that the Defendant admitted to the robbery and that he "enjoyed" being covered in the victims' blood. There was also eyewitness testimony that the Defendant possessed Jeffries' stolen RAV4 and warned Dillard not to take the car into town. Dillard also saw the Defendant remove the victims' work IDs from his person. A rational trier of fact could have easily found that the Defendant and his mother conspired

to rob the Defendants using the revolver, killed them with the revolver during the course of the robbery, and stole Jeffries' brand new RAV4, valued at over $18,000, and various electronics, including televisions, a heater, the Cyclops digital recorder, two tablet computers, cell phones, and the victims' wallets, including their credit cards, which were used by the Defendant and Hart. The Defendant essentially asks this court to ignore the extensive witness testimony presented at trial and deem it unreliable. However, the jury clearly accredited the testimony that was presented at trial. Choosing to accredit a witness is completely within the province of the jury. State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) ("The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact."). We may not reweigh or reconsider the jury's assessment of Geren's or Dillard's credibility on appeal, regardless of the Defendant's assertion that Geren's testimony was "colored by his feelings for" the Defendant or that Dillard's testimony was unreliable because of her occupation as a drug dealer and her cooperation with the State. The Defendant is not entitled to relief.

**II. Consecutive Sentencing.** The Defendant contends that the trial court abused its discretion in ordering the sentences in Counts 4 and 8 to run consecutively to each other, asserting that the Defendant should not qualify as a dangerous offender and that the Wilkerson factors were misapplied. The State responds that the trial court was right to classify the Defendant as a dangerous offender, even if his mother actually pulled the trigger, and correctly applied the Wilkerson factors. We agree with the State.

In Pollard, the Tennessee Supreme Court held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013); see State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). The court explained that "the presumption of reasonableness . . . giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 861. It reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, the trial court imposed consecutive sentencing after finding that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). The Pollard court explained that two additional findings must be made when applying the dangerous offender classification:

Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act [of 1989] requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentences.

Pollard, 432 S.W.3d at 863 (quoting Wilkerson, 905 S.W.2d at 938). Therefore, when imposing consecutive sentences pursuant to the dangerous offender classification, the trial court must conclude that the proof has established that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts[.]" Id. (quoting Wilkerson, 905 S.W.2d at 938). Unlike the other six subsections, the trial court must make additional findings for the dangerous offender classification because it is "the most subjective and hardest to apply." State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In the instant case, the trial court determined that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The State and the Defendant both conceded that the offenses involved more than one victim. The trial court considered the presentence report and victim impact statements before determining that the Defendant had no hesitation about committing a crime in which the risk to human life was high. The trial court also determined that the Defendant abused a position of trust based on the Defendant's "develop[ing] a relationship with . . . these victims as a result of the victims permitting him to spend the night in their home." The court elaborated that "as a result of

- 28 -

that he got information as to their property and their belongings, and then he breached that private trust and used it to come back with his mother and commit the crimes which he now stands [] convicted[.]" The court also made the additional findings required by Wilkerson, specifically stating that "the circumstances surrounding the commission of this offense are aggravated[,]" and "confinement for an extended period of time is necessary to protect society from this defendant's unwillingness to lead a productive life and the [D]efendant[']s resort to criminal activity in furtherance an anti-societal lifestyle." [IX, 69-70]. In determining that the circumstances of the offenses were aggravated, that confinement for an extended time was necessary to protect society, and that the aggregate length of the sentences reasonably related to the offenses of which the Defendant stood convicted, the trial court reiterated

> Two men were murdered. Two men that opened their home to the [Defendant]. He abused that private trust to later come back and not just commit a robbery, but actually killed them. And the killing wasn't during the perpetration of any fight. There'[re] no defensive wounds. The one man's shot in the back and both of them are shot in the back of the head. So this is an execution-style killing. And then afterw[a]rds the house is emptied out. The commission of these offenses are aggravated.

> I find the next factor that confinement for an extended period of time is necessary to protect society from this defendant's unwillingness to lead a productive life and the [D]efendant's resort to criminal activity in furtherance an anti-societal lifestyle. This defendant is a young man. He openly acknowledges selling guns and drugs to support himself. He claims to have worked a job at one time, but that's not even verified and so I rely on his testimony or his statement that he used crime to support his lifestyle. And [] it is an anti-societal lifestyle. He preys upon people, steals from people, buys and s[ell]s within the criminal milieu, and ends up killing two men.

> I also find that the aggregate length of the sentences reasonably relates to the offense for which the defendant stands convicting.

Despite the Defendant's assertions to the contrary, we conclude that the Defendant in this case had absolutely no hesitation about committing a crime in which the risk to human life was high. The Defendant cites Russel David Farmer v. State, No. 03C01-9405-CR-00161, 1995 WL 40286, *2 (Tenn. Crim. App. Feb. 3, 1995), perm. app. granted (Tenn. Oct. 16, 1995) for the erroneous proposition that the Defendant cannot be classified as a dangerous offender when it is unclear whether he or his mother actually pulled the trigger killing Walker and Jeffries. The Defendant fails to realize that the court in Farmer analyzed the consecutive sentencing decision under the previously-used factors from State v. Woods,

814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), perm. app. denied (Tenn. 1991), rather than the currently-used Wilkerson factors. In fact, Farmer was ultimately appealed to our supreme court and was remanded to this court for analysis under the Wilkerson factors. See State v. Russel David Farmer, No. 03C01-9405-CR-00161, 1999 WL 674779, at *1 (Tenn. Crim. App. Oct. 31, 1997). Upon utilizing the Wilkerson factors, this court upheld Farmer's classification as a dangerous offender and his consecutive sentencing, despite the fact that it remained unclear whether he or one of his co-defendants actually killed the victim in that case. Id. at *3.

In concluding that the Defendant is a dangerous offender, we reiterate that his behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(4). The evidence presented at trial demonstrated that the Defendant told Hart about the victims' possessions after they allowed him to spend the night in their home due to his apparent homelessness. The Defendant and Hart planned the robbery and prepared for it. They stole a safe from Dillard, and the Defendant picked the lock on the safe and acquired the revolver that was most likely the murder weapon based on the evidence presented. They tried to enlist the help of Jaynes, who declined to participate in the robbery. The victims were shot from behind at point-blank range. Hart and the Defendant stole everything of value from the home, including the RAV4, and gave those items to Dillard, their drug dealer. They also utilized Jeffries' credit card to make multiple purchases. The Defendant also confessed his participation in the killings to Geren, and he told Geren that he "enjoyed" being covered in the victims' blood. The circumstances surrounding the offenses are clearly aggravated. The trial court did not abuse its discretion in classifying the Defendant as a dangerous offender. Moreover, the record supports the trial court's findings that the terms imposed in this case were reasonably related to the severity of the offenses committed and were necessary in order to protect the public from further criminal acts by the Defendant. See Pollard, 432 S.W.3d at 863. The Defendant self-reported making a living selling drugs and firearms since the age of thirteen. The Defendant was rated "high risk" in multiple categories of the "Strong-R" assessment. The trial court also noted that felony murder and especially aggravated robbery are both required to be served at 100 percent, and the Defendant was convicted of murdering and robbing two separate victims. The consecutive sentences are thus reasonable related to the crimes of which the Defendant was convicted. Accordingly, we conclude that the trial court did not abuse its discretion in ordering the Defendant's twenty-year sentences for especially aggravated robbery be served consecutively to his two life sentences for felony murder, for an effective sentence of two life sentences plus twenty years. The Defendant is not entitled to relief.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE